## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

NELSON IRIZARRY,                          :
     Plaintiff,                          :          CIVIL ACTION NO.
                                       :          3:11-CV-01658 (JCH)
     v.                          :
                                         :          MARCH 24, 2014
UNITED PARCEL SERVICE, INC.               :
     Defendant.                          :

## RULING RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 42)

### I.    INTRODUCTION

Plaintiff Nelson Irizarry ("Irizarry") alleges that defendant United Parcel Service, Inc. ("UPS") terminated him because of his age, in violation of the Age Discrimination in Employment Act (ADEA), title 29, United States Code, sections 621 through 634 and the Connecticut Fair Employment Practices Act ("CFEPA"), Connecticut General Statues, section 46a-60 et. seq.  In response, UPS has filed a Motion for Summary Judgment ("Def.'s Mot. for Summ. J.") (Doc. No. 42).

### II.    FACTUAL AND PROCEDURAL BACKGROUND

#### A.    Irizarry's Employment with UPS

UPS employed Irizarry for over twenty-two years, from 1987 until January 12, 2010; from 1998 until his termination, Irizarry served as an Operations Supervisor. Defendant's Local Rule 56(a)(1) Statement ("Def.'s L.R. 56(a)(1) Stmt.") (Doc. No. 42-7) at ¶¶ 3-4; Plaintiff's Response to Defendant's Local Rule 56(a)(1) Statement ("Pl.'s L.R. 56(a)(1) Stmt. Reply") (Doc. No. 46) at ¶¶ 3-4.  At the time of his termination, Irizarry was assigned to a UPS facility in Watertown, Connecticut as an On-Road Supervisor. Def.'s L.R. 56(a)(1) Stmt. at ¶ 10; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 10.

1

During the last year of Irizarry's employment, James Marciano ("Marciano") was the UPS Business Manager in Watertown and Irizarry's direct supervisor. Def.'s L.R. 56(a)(1) Stmt. at ¶ 11; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 11. Marciano reported directly to Chris Walsh ("Walsh"), who was the Division Manager at the time; Walsh reported both to Kelly Schmaltz ("Schmaltz"), the District Package Operations Manager, and John Loughery ("Loughery"), the District Manager. Def.'s L.R. 56(a)(1) Stmt. at ¶ 13; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 13. At all relevant times, Hans Hasemann ("Hasemann") also served as an Operations Supervisor employed in UPS's Watertown, Connecticut facility, and Marciano was also Hasemann's direct supervisor in 2009. Def.'s L.R. 56(a)(1) Stmt. at ¶ 15; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 15.

　　B.　　Age-Related Comments

Irizarry reports that, in the year before to his termination from UPS, a number of comments were made regarding his age. He claims that Marciano told him that "the young guns are doing a better job than you." Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 135.[1] UPS reports that Irizarry stated that Marciano made this remark once during a

---

[1] UPS claims that Irizarry stated that Marciano made this statement to Hasemann. Defendant's Local Rule 56(a)(1) Statement ("Def.'s L.R. 56(a)(1) Stmt.") (Doc. No. 42-7) at ¶ 135. However, the transcript excerpt cited by UPS in support of this statement is unclear on whether or not Irizarry intended to testify that the above statement was directed towards him. The excerpt reads as follows:

Q: Did you ever hear anyone at UPS say anything to Mr. Hasemann about his age?

Irizarry: Yeah.

Q: Who?

Irizarry: Chris Walsh told him one time . . . What, are you getting too old for the job, or the young guns are bringing him in. Jay Marciano, that was his favorite one. Oh, the young guns are doing a better job than you.

See Def.'s L.R. 56(a)(1) Stmt. at Ex. 1, at 137:23-138:6.

production ride in 2009.  Def.'s L.R. 56(a)(1) Stmt. at ¶¶ 135-36.  However, Irizarry disputes this.  Irizarry testified that Marciano told him this when they went on production rides throughout 2009.  Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 135.  Marciano also allegedly said to him at some point in 2009, that "the young bucks are kicking your butt;" that "either you're getting too old for this, or Nichols is showing you up;" that Irizarry was getting too old for his job; and that "[m]aybe this job is not for you anymore."  Def.'s L.R. 56(a)(1) Stmt. at ¶ 140; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 140; Plaintiff's Amended Local Rule 56(a)(2) Statement ("Pl.'s Amend. L.R. 56(a)(2) Stmt.") (Doc. No. 49) at ¶ 11. Haseman, according to Irizarry, was told by Marciano, "all the time," "[w]hat[,] are you getting too old for the job?"  Pl.'s Amend. L.R. 56(a)(2) Stmt. at ¶ 10.

Irizarry further alleges that Walsh made similar comments to him and Hasemann. Six months before his termination, Irizarry claims that Walsh asked Hasemann, in Irizarry's presence, "[y]ou gonna let these young guns kick your butt or do better than you?"  Pl.'s Amend. L.R. 56(a)(2) Stmt. at ¶ 12.  Walsh made this statement, according to Irizarry, while placing both of his hands on the shoulders of a twenty-two-years-old On-Road Supervisor.  Id.  Walsh also allegedly told Hasemann that he was getting too old for his job.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 142; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 142; Pl.'s Amend. L.R. 56(a)(2) Stmt. at ¶ 13.  Irizarry denies UPS's claim that this comment was made during the single instance of reviewing driver production numbers; he instead asserts that Walsh stated "in general" that the "young guns" were "performing better than the older employees."  Def.'s L.R. 56(a)(1) Stmt. at ¶ 143; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 143.

UPS notes that Irizarry could not say that Marciano had animus toward him because of his age.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 137.  However, Irizarry denies this, observing instead that, when asked whether he believed that Marciano had animus toward him, Irizarry testified that he "[c]ouldn't tell you that he did," and that Irizarry later testified that he believed that Marciano's comments did reflect age-related animus.  Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 137.

C.   Irizarry's Closure of the Watertown[2] UPS Facility in 2009

On Christmas Eve 2009, at approximately 10:00 A.M., Security Supervisor John Pinchbeck ("Pinchbeck") asked Irizarry to close the Watertown facility.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 21; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 21.  The closing procedure including closing doors, checking locked doors, and locking the UPS vehicles parked in the UPS Yard surrounding the facilities; the parties dispute whether the procedure also involved collecting keys from the UPS vehicles.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 32; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 32.

Irizarry testified that he was told to return to the Watertown facility after 9:30 P.M. Def.'s L.R. 56(a)(1) Stmt. at ¶ 33; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 33.  He asserts, however, that he agreed to return to the facility at "no planned time."  Pl.'s Amend. L.R. 56(a)(2) Stmt. at ¶ 32.  He understood that he should return before the car washers left so that the building was not left unsecured.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 34; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 34.  He was informed that the car washers would be finished between 9:30 P.M. and 9:45 P.M.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 33; Pl.'s L.R. 56(a)(1)

---

[2] UPS's Local Rule 56(a)(1) Statement interchangeably refers to the UPS facility at issue as the "Watertown facility" and the "Waterbury facility."  Throughout the record, however, the UPS facility is consistently referred to as the "Watertown facility."  Thus, the court will adopt the latter identification in this decision.

Stmt. Reply at ¶ 33.  Irizarry did not return until after 10:00 P.M.; he claims that his departure to the facility was delayed because he had difficulty locating a blow torch he used to unfreeze the locks on UPS's gates.[3]  Def.'s L.R. 56(a)(1) Stmt. at ¶ 33; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 33.

On Christmas Eve, Irizarry told Hasemann that he would be closing the Watertown facility that night, and invited Hasemann to his home for dinner.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 35; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 35.  When Irizarry arrived home that evening, at around 7:45 P.M., he had a drink with his family to celebrate their purchase of a Florida condominium.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 37; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 37.  Hasemann arrived later.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 38; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 38.  Irizarry acknowledges that Hasemann had a glass of wine with dinner, but notes that it was non-alcoholic wine.  Pl.'s Amend. L.R. 56(a)(2) Stmt. at ¶ 37.  After dinner, Irizarry asked Hasemann to close the building with him.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 41; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 41.

During dinner, Irizarry placed his cell phone on the counter in the kitchen.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 40; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 40.  He could not recall whether he put his phone on vibrate or turned it off.  Id.  The parties dispute whether Irizarry testified that he could not recall whether he received any calls or talked to anyone from UPS that evening.   UPS asserts that Irizarry stated that he did not receive any calls; Irizarry claims that he stated only that he could not recall whether he had spoken with anyone from UPS from the time he left work to the time he put his phone on

---

[3] Irizarry also claims that UPS's Watertown facility had been left unsecure on a number of prior occasions, with full knowledge of management because UPS lacks a system to predict with certainty when the facility will be ready to close and whether the facility is secured.  Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 33.

silent.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 42; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 42.

Pinchbeck testified that he spoke with Irizarry by telephone at 9:43 P.M. and confirmed

that Irizarry would be closing just after 10 P.M.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 43; Pl.'s

L.R. 56(a)(1) Stmt. Reply at ¶ 43.  Irizarry insists that he did not speak with Pinchbeck

by telephone.  Id.

Kathy Bresnahan ("Bresnahan"), to whom Pinchbeck reported, states that

Pinchbeck called her around 9:45 P.M. to say that Irizarry would be going over to the

Watertown facility at approximately 10:05 P.M.  Def.'s L.R. 56(a)(1) Stmt. at ¶¶ 27, 45;

Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶¶ 27, 45.  Pinchbeck called Bresnahan at around

10:45 P.M. to tell her that he was headed to the Watertown building.  Def.'s L.R.

56(a)(1) Stmt. at ¶ 47; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 47.  At 10:47 P.M., and again

at 10:48 P.M., Pinchbeck called Irizarry, as he had not heard from him.  Def.'s L.R.

56(a)(1) Stmt. at ¶ 46; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 46.  His calls were not

answered.  Id.

At 10:51 P.M., Pinchbeck left his house to drive to Watertown.  Def.'s L.R.

56(a)(1) Stmt. at ¶ 48; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 48.  Pinchbeck lived thirty-

seven miles from Watertown; it would take him forty-five to sixty minutes to reach the

facility from his home.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 24; Pl.'s L.R. 56(a)(1) Stmt. Reply

at ¶ 24.  At 10:55 P.M., Pinchbeck received a call from John Dinatale ("Dinatale"), a

Manager for the UPS Feeders Group in Watertown.  Def.'s L.R. 56(a)(1) Stmt. at ¶¶ 50,

51; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶¶ 50, 51.  Dinatale informed Pinchbeck that one

of the Watertown Feeders Group's former drivers had told him that he was at the

Watertown building, that it was wide open, that the carwashers were leaving, and that

there was no one there to lock up the building.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 51; Pl.'s

L.R. 56(a)(1) Stmt. Reply at ¶ 51.

Irizarry drove his daughter and Hasemann the quarter-mile to the Watertown

facility from his home on Christmas Eve to perform the lock-up.  Def.'s L.R. 56(a)(1)

Stmt. at ¶ 53; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 53.  He testified that, upon their arrival,

the front gate to the facility was unlocked and wide open, that he dropped Hasemann off

at the front of the building to start closing overhead doors, that the dropped his daughter

off in the UPS Yard and asked her to check whether the UPS vehicles had keys in

them, and that he circled the building, then went inside to help Hasemann.  Def.'s L.R.

56(a)(1) Stmt. at ¶ 53; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 53.

Irizarry was aware that there were safety rules that applied to the Yard, and he

was trained and certified on Yard safety.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 63; Pl.'s L.R.

56(a)(1) Stmt. Reply at ¶ 63.  He understood that, per the Yard Control Policy, UPS

employees could not go past designated areas in the Yard unless they were Yard-

certified.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 64; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 64.  The

Policy does not specifically address the presence of family members of UPS employees

but, as they are not Yard-certified, they are not permitted in the Yard.  Def.'s L.R.

56(a)(1) Stmt. at ¶ 58; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 58.  Irizarry disputes UPS's

claim that no UPS customer, visitor, of family member of an employee should ever be in

the work areas of the Yard performing UPS work.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 60;

Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 60.  He claims that there is no document or training

at UPS makes such a prohibition.  Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 60.  He also notes

that he brought his daughter to the facility on many occasions when he closed it, with

the full knowledge of his supervisors, including Marciano and Walsh; that his wife, who is not a UPS employee, performed UPS work at one of UPS's annual motorcycle rides, with full knowledge of UPS management; and that, on one occasion, his wife moved rental trucks from outside the UPS gate to inside with the knowledge of his manager at the time. Id.; Pl.'s Amend. L.R. 56(a)(2) Stmt. at ¶ 39. His manager commended him for having his wife assist him. Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 60. According to Irizarry, other, younger, UPS employees have brought their children into the UPS yard, and none, to his knowledge, were disciplined for doing so. Pl.'s Amend. L.R. 56(a)(2) Stmt. at ¶ 108. Marciano testified that he "probably" brought his daughter into the UPS yard one day in 2009, and that he believes Walsh did the same thing. Id. at ¶ 109. He states that the Watertown facility has no signage indicating that non-certified individuals are limited to any portion of the UPS Yard, and that no UPS document reflects UPS's policy when the Yard is closed. Id. at ¶¶ 113-14. He further observes that, despite UPS's assertion that permitting a family member to collect keys from UPS vehicles is a violation of the Yard Control Policy, this information is not found in any UPS document or training. Id. at ¶ 62.

Irizarry states that he did not tell his daughter to take keys out of the UPS vehicles, but concedes that she did collect the keys out of the vehicles. Def.'s L.R. 56(a)(1) Stmt. at ¶ 65; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 65. The parties dispute whether Irizarry stated that his daughter would never collect the keys. Id. Irizarry claims that, when he testified that his daughter "would never do that," he was referring to the times he brought his daughter with him to close when she was much younger. Id. He also asserts that, on previous occasions when he closed the facility, he brought his

daughter along, and that it was common knowledge within UPS that he did so.  Def.'s L.R. 56(a)(1) Stmt. at ¶¶ 66-67; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶¶ 66-67.  Irizarry's daughter, however, testified that, before Christmas Eve 2009, she had last accompanied her father to secure the UPS facility when she was a child.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 68; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 68.

Pinchbeck arrived at the Watertown site to find Irizarry and Hasemann on the property at 11:40 P.M.; by that time, the lockup was almost complete.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 70; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 70.  Irizarry believes that he had been at the facility for more than half an hour by the time Pinchbeck arrived, and that it took him around an hour to close the facility, though he could not recall exactly how long he had been at the facility before Pinchbeck's arrival or how long it took him to close.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 71; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 71.

Pinchbeck asked Irizarry if he had been drinking that night; Irizarry responded that he had, and that he had had two drinks—one before dinner, and one during dinner "that ran after dinner."  Def.'s L.R. 56(a)(1) Stmt. at ¶ 73; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 73.  Pinchbeck told Irizarry that he had been trying to call Irizarry on his cell phone.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 74; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 74.  After Irizarry told Pinchbeck what work remained undone, Pinchbeck told Irizarry and Hasemann that they could leave and that he would complete the closing.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 76; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 76.

In observing the behavior of Irizarry and Hasemann, Pinchbeck reports that he thought that Irizarry and Hasemann appeared to be intoxicated.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 77; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 77.  Pinchbeck's basis for believing

Irizarry to be intoxicated was that his behavior "appeared to be extremely jovial and boisterous," and "was uncharacteristic from what [Pinchbeck] had seen in a work environment."  Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 77.  Irizarry attributes his and Haseman's behavior to excitement and enthusiasm.  Pl.'s L.R. 56(a)(2) Stmt. at ¶ 49. Pinchbeck had Irizarry and Haseman exit the building and set the alarm.  Id. Irizarry invited Pinchbeck to his house for a drink; Pinchbeck declined.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 78; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 78.

UPS alleges that, at 1:00 A.M. on Christmas morning, Pinchbeck informed Bresnahan that he suspected that Irizarry and the other individual with him may have been drinking, that Pinchbeck had completed the lockup, and that the front gate was frozen.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 79.  Irizarry denies this, however, and states instead that Bresnahan testified that the first time she heard about Irizarry's alleged intoxication was on December 28.  Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 79.

Pinchbeck, according to Irizarry, did not comply with UPS policy requiring supervisors who believe they have observed intoxicated employees to "take immediate steps."  Pl.'s Amend. L.R. 56(a)(2) Stmt. at ¶ 53.  The Fitness for Duty Checklist requires the employee completing it to note the seriousness of the conduct committed by the employee suspected of being intoxicated.  Id. at ¶ 54.  Dennis Ray ("Ray"), then a UPS District Human Resources Manager, explained that he believed that neither Irizarry nor Hasemann was sent for a Fitness for Duty test because they did not demonstrate the criteria that would warrant it.  Id. at ¶ 55.  Also contrary to UPS Policy, Irizarry alleges, Pinchbeck did not attempt to dissuade Irizarry from driving himself, his daughter, and Hasemann home.  Id. at ¶ 57.  Pinchbeck testified that he did not know

10

whether Irizarry was actually intoxicated, and Ray similarly expressed doubt, from reviewing Pinchbeck's statement, that Pinchbeck knew that Irizarry was intoxicated. Id. at ¶ 60.

Irizarry insists that he was not intoxicated when performing the closing. Id. at ¶ 88. He notes that he had consumed fewer than two drinks over the course of several hours and a large dinner and that he performed the closing with no errors. Id. at ¶ 91. In light of this, he claims, his actions during the closing did not subvert the purpose of UPS's alcohol policy to ensure that employees, their judgment, and their safety are not impaired when performing their jobs. Id. at ¶ 95.

On Christmas morning, Marciano received a text message from Dinatale reporting that one of his drivers had returned to the Watertown building on Christmas Eve and found no one there. Def.'s L.R. 56(a)(1) Stmt. at ¶ 80; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 80. Marciano then contacted Pinchbeck, who told him what he had observed on the Watertown facility, and that he was reporting the incident to Bresnahan. Def.'s L.R. 56(a)(1) Stmt. at ¶ 81; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 81. After speaking with Dinatale and Pinchbeck on Christmas Day, Marciano left a message for Walsh. Def.'s L.R. 56(a)(1) Stmt. at ¶ 82; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 82.

Upon return to work after the holiday, Marciano questioned Irizarry about why he had not timely closed, why he had not answered his telephone when Pinchbeck tried to reach him, and whether he had been drinking before closing. Def.'s L.R. 56(a)(1) Stmt. at ¶ 84; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 84. Irizarry admitted that he had had a drink; however, Irizarry notes, Marciano never inquired of Irizarry as to whether he was intoxicated during closing or whether the amount of alcohol he consumed impaired his

ability to close.  Id.  Marciano relayed what he had learned to Walsh.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 85; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 85.

Upon Bresnahan's request, Pinchbeck prepared a timeline and memorandum[4] regarding the Watertown Christmas Eve lockup.[5]  Def.'s L.R. 56(a)(1) Stmt. at ¶ 86; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 86.  Bresnahan called Chris Wheeler ("Wheeler"), the District Security Manager, and informed him that the Christmas Eve lockup had been

_____

[4] Pinchbeck recorded the following observations in the memorandum:

> When arriving at the Watertown facility at 23:40 on Christmas Eve I met with Nelson Irizarry and Hans Hasemann who were about finished with the lock up of the facility.  Both appeared to be extremely jovial and boisterous.  Their behavior was uncharacteristic from what I have seen in a work environment.  I immediately suspected that they had both been drinking.  I asked Nelson if he had and he replied yes.  I never asked Hans directly if he had been drinking. Nelson invited me over to his house for cocktails after we were finished. I declined by telling him that I just wanted to go home.

> Nelson and I had walked over to the area of Door 110 and he showed me the problem he was having with the roller.  The roller was stuck against the frame. We were able to rectify the problem and get the roller into the trailer and the door secured.  While we were at the door, Hans came over to show me that he had removed all the keys from all the package cars that were parked outside.  He then proceeded to dump all of the keys on the floor. I said at that point that we needed to pick them all up.

> From there we checked the rollers on Door 100 and closed the door.  We then checked the pedestrian doors on the back side of the building to insure they were locked.  When we got to the door at the end of primary near unload Door 10, Hans said that I will show you that it is secure by running into it.  We then went into the automotive area and checked those doors.

> At this point we all walked back to the front of the building near the alarm panel and I told Nelson and Hans that they could go and that I would finish up.  After they both walked out I went back to Door 110 and picked up the vehicle keys that had been dumped on the floor and put them in the Waterbury North office.

Def.'s L.R. 56(a)(1) Stmt. at ¶ 88; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 88.

[5] Irizarry objects to Bresnahan's claim that Pinchbeck told her that he gathered the times for his timeline from his cell phone records on the grounds that it is hearsay.  Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 87.  While the court is inclined to sustain Irizarry's objection, it finds that it need not reach a decision on whether this statement is hearsay because admission of the statement in connection with the Motion for Summary Judge does not affect the court's decision.

late; that Irizarry was responsible for the lockup; that Hasemann had accompanied him; that Pinchbeck had been unable to get in touch with Irizarry, and thus had to go to the Watertown facility; and that Pinchbeck believed that Irizarry and Hasemann may have been intoxicated.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 89; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 89.  Bresnahan also provided Wheeler with a copy of Pinchbeck's memorandum.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 90; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 90.

After meeting with Irizarry and Hasemann, Walsh spoke with Schmaltz and told her what he had learned from Marciano, Irizarry, and Hasemann.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 91; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 91.  He then received a call from Wheeler to discuss follow up.  Id.  Following standard operating procedure for when a UPS management employee is thought to be in breach of UPS policies, Wheeler began an investigation into the conduct reported by Pinchbeck.  Def.'s L.R. 56(a)(1) Stmt. at ¶¶ 92-93; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶¶ 92-93.  Managers were required to conduct investigations into breaches involving Supervisors; thus, Walsh was not involved in the investigation.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 94; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 94.

Wheeler reports that, in conducting the investigation along with the Workforce Planning Manager, he spoke with Pinchbeck and reviewed his write-ups; spoke with Walsh and reviewed with him what he knew of the incident; met with Marciano; interviewed Hasemann and Irizarry separately; and obtained written statements from Irizarry and Hasemann.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 96; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 96.

The parties dispute the accuracy of Wheeler's account.  UPS acknowledges that Wheeler "suggest[ed] some language" to Irizarry and Hasemann for their statements,

13

but claims that they had already admitted that they had arrived late for closing after they had been drinking.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 96.  Irizarry specifically admitted that he had consumed two drinks before the closing.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 99; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 99.  Irizarry testified that aspects of Wheeler's account are untrue, including its reference to a planned closing time when, according to Irizarry, there was no such planned time.  Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 96.  He and Hasemann also state that Walsh dictated their statements to them, telling them to "just write down that you know what went on, it will never happen again . . . [and that the] problem will go away . . . ."  Id.

From his investigation, Wheeler concluded that Irizarry arrived at the Watertown facility at 11 P.M., despite understanding that the plan was for him to be there between 9:30 P.M. and 9:45 P.M., and that Irizarry and Hasemann "had drunk at least as many drinks as they were willing to admit," in violation of the UPS Alcohol Policy prohibiting drinking before coming to work.  Def.'s L.R. 56(a)(1) Stmt. at ¶¶ 105-06; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶¶ 105-06.  This investigation was the second time in approximately six months that Wheeler had been called to Waterbury for an investigation involving Irizarry.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 108; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 108.

Walsh and Wheeler reported the closing incident to Ray; Wheeler also provided his investigation documents to him.  Def.'s L.R. 56(a)(1) Stmt. at ¶¶ 101-02; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶¶ 101-02.  Wheeler testified that in early January 2010, Ray asked him his opinion on what discipline should be imposed on Irizarry and Hasemann; Wheeler told Ray that he believed Irizarry and Hasemann should be terminated.  Def.'s

14

L.R. 56(a)(1) Stmt. at ¶ 104; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 104.  Walsh also states that he recommended that Irizarry be terminated to Ray.  Pl.'s Amend. L.R. 56(a)(2) Stmt. at ¶ 64.  Marciano testified that he did not make any recommendations or give his opinion regarding the discipline of Irizarry or Hasemann.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 141; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 141.  Following standard protocol, Ray prepared a memorandum summarizing his review of Wheeler's investigation and the investigation documents for Loughery, his boss, and set out the options for disciplining Irizarry.  Def.'s LR. 56(a)(1) Stmt. at ¶ 123; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 123.

The parties dispute the basis for Ray's decision to terminate Irizarry.  UPS states that Ray decided to terminate Irizarry and Hasemann after considering Wheeler's investigation, Pinchbeck's memorandum and timeline, and the statements from Irizarry and Hasemann, and reviewing the incident with Loughery and Kevin Di Libero, the Region Employee Relations Manager.  Def.'s L.R. 56(a)(1) Stmt. at ¶¶ 110-11.  He notes that Di Libero supported his decision to termination.  Id. at ¶ 125.  Ray's concern in reaching this decision, according to UPS, was not whether Irizarry and Haseman were "fit for duty," but whether they had violated the alcohol policy.  Id. at ¶ 113.  UPS policy prohibits employees from using alcoholic beverages, regardless of whether they are impaired from doing so, before they begin work.  Id. at ¶¶ 114-16.  UPS claims that this policy is "zero-tolerance."  Id. at ¶ 115.  UPS acknowledges that Ray initially recommended to Loughery and Di Libero that Irizarry be disciplined by withholding awards and giving Irizarry a "final warning."  Id. at ¶ 124.  Ray's memorandum also identified Irizarry's decision to have his daughter recover the UPS car keys, in violation

of Yard Control protocol and a potential breach of security protocol, as a basis for disciplinary action.  Id. at ¶ 126.

Irizarry, however, notes that, though Ray refers to this recommendation as an "initial" or "preliminary" one, the memorandum itself contains no such qualification.  Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 110.  He also claims that Ray recommended that Irizarry not be terminated, in part because UPS could "not establish whether or not he was intoxicated."  Pl.'s L.R. 56(a)(2) Stmt. at ¶ 87.  He observes that, sometime after submitting this recommendation, Ray decided to recommend termination.  Id.  Ray could not recall why he changed his mind or whether he changed his mind before or after he spoke with Walsh, and no document reflecting this new recommendation exists. Id.

Irizarry further denies that the Alcohol Policy was "zero-tolerance," and notes that no UPS document refers to the policy as such.  Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 115. He avers that the policy leaves appropriate discipline for its violation up to the discretion of the decision-maker, and that the decision-maker must consider "the totality of the circumstances," including the employee's past disciplinary history, whether the employee's conduct placed anyone in danger, and whether or not the employee was actually intoxicated.  Id. at ¶ 115.  UPS agrees that determining what discipline to impose upon Irizarry and Hasemann for violation of the alcohol policy was in Ray's complete discretion.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 122.  Irizarry understood UPS policy to bar him from drinking before going to work, and that determining how long "before" going to work he could drink without violating the alcohol policy was a matter of "common sense."  Def.'s L.R. 56(a)(1) Stmt. at ¶ 118; Pl.'s L.R. 56(a)(1) Stmt. Reply at

¶ 118.  He insists that the alcohol he consumed before closing the facility did not impair him in any way.  Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 118.

Prior to the incident involving Irizarry and Hasemann, Ray had never been aware of any other violation of the alcohol policy by a Manager or Supervisor, or any other incident of a Supervisor admitting to drinking before starting work, in his eighteen prior years working in Human Resources.  Def.'s L.R. 56(a)(1) Stmt. at ¶¶ 119-20; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶¶ 119-20.  UPS could not identify any managers who had been terminated for violating the alcohol policy.  Pl.'s L.R. 56(a)(2) Stmt. at ¶ 98.  Marciano admitted that it was possible that he had conducted UPS business while drinking, and his experience was that managers conducting company business while drinking was not uncommon.  Id. at ¶¶ 99-100.  Marciano was never disciplined for working while drinking.  Id. at ¶ 100.  Irizarry cites three instances of UPS employees working while intoxicated.  A 34-year-old UPS truck driver, according to Irizzary, repeatedly reported to work smelling of alcohol and admitted to a supervisor that he was intoxicated; he was given treatment, permitted to keep his job, and still works at UPS.  Id. at ¶ 101.  Another employee in his late thirties or early forties went to a bar during his scheduled work day, got drunk, drove a UPS truck, and mis-delivered customer packages; Irizarry reports that he was not terminated.  Id. at ¶ 102.  Bresnahan also testified about a driver who drank alcohol during lunch, subsequently drove his UPS truck, and was not terminated.  Id. at ¶ 103.

Six months before the closing incident, Irizarry admitted to falsifying a driver's time record.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 127; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 127.  UPS claims that Ray was aware of the incident before the closing infraction because he

recorded the discipline Irizarry received for it in September 2009. Def.'s L.R. 56(a)(1) Stmt. at ¶ 128. Irizarry notes that Ray testified that he did not review the facts of this prior instance of misconduct before recommending termination. Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 127.

In January 2010, UPS terminated both Irizarry's and Hasemann's employment. Def.'s L.R. 56(a)(1) Stmt. at ¶ 131; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 131. At the time of termination, Irizarry was 49 years old; Hasemann was 44; Ray was 46; Walsh was 45; Marciano was 51; Pinchbeck was 52; and Wheeler was 46. Def.'s L.R. 56(a)(1) Stmt. at ¶ 132; Pl.'s 56(a)(1) Stmt. Reply at ¶ 132. Walsh and the Employee Relations Manager informed Irizarry of his termination. Def.'s L.R. 56(a)(1) Stmt. at ¶ 133; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 133.

D.    Post-Termination

Irizarry initially believed that he had been terminated because Pinchbeck was angry with him because he had turned off his cell phone, causing Pinchbeck to have to travel a lengthy distance to the Waterbeck facility. Def.'s L.R. 56(a)(1) Stmt. at ¶ 144; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 144. He reports that he later came to believe that he and Hasemann were terminated because of their ages for the following reasons: they were replaced by younger people with less experience; they were both long-term employees who met or exceeded expectations; they did nothing wrong and were not intoxicated during closing; Irizarry's supervisors knew he had brought his daughter to the facility during past closings; Irizarry was doing a favor to UPS by closing on a holiday; and both Marciano and Walsh had made ageist comments. Id.

After UPS terminated Irizarry, it rotated Marc Caputo into Irizarry's assignment in Watertown.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 141; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 141.  The move was neither a promotion nor a demotion.  Id.  Irizarry, however, observes that Caputo's former position was as an FT IE OPS Improvement Supervisor, a role that, he asserts, does not involve the supervision of any employees.  Id.  Irizarry also alleges that Walsh reassigned Caputo, 33-years-old at the time, to his position, and that Walsh replaced Hasemann with a 27-year-old.  Pl.'s L.R. 56(a)(2) Stmt. at ¶ 15.  When Caputo was promoted, Irizarry notes that Walsh replaced him with a 22-year-old, who was a UPS driver when Irizarry and Hasemann were terminated, and thus was promoted into management.  Id. at ¶ 16.  According to Irizarry, prior to the termination of Irizarry and Hasemann, two out of three of the supervisors in Marciano's division, which was overseen by Walsh, were in their mid-to-late forties.  Id. at ¶ 17.  After their termination, all three supervisors were either in their twenties or early thirties.  Id.  Marciano and Irizarry both testified that Irizarry and Hasemann had more supervisory experience than their younger replacements.  Id. at ¶ 18.

### III.   STANDARD OF REVIEW

A motion for summary judgment is properly granted only if "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."  O'Hara v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 642 F.3d 110, 116 (2d Cir.2011).  Thus, the role of the district court in deciding a summary judgment motion "is to determine whether genuine issues of material fact exist for trial, not to make findings of fact."  Id.  In making this determination, the court must resolve all ambiguities and draw

19

all inferences in favor of the party against whom summary judgment is sought.  See Garcia v. Hartford Police Dep't, 706 F.3d 120, 127 (2d Cir.2013).

"The moving party bears the burden of establishing the absence of any genuine issue of material fact." Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir.2010).  Once the moving party has satisfied that burden, to defeat the motion "the party opposing summary judgment . . . must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" Wright v. Goord, 554 F.3d 255, 266 (2d Cir.2009) (quoting Fed. R. Civ. P. 56(e)).  "For summary judgment purposes, a 'genuine issue' exists where the evidence is such that a reasonable jury could decide in the non-moving party's favor." Cambridge Realty Co., LLC v. St. Paul Fire & Marine Ins. Co., 421 F. App'x 52, 53 (2d Cir.2011); see also Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 104 (2d Cir.2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)) (stating that the non-moving party must point to more than a mere "scintilla" of evidence in its favor).  "[U]nsupported allegations do not create a material issue of fact." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir.2000).

## IV.   DISCUSSION

To withstand a motion for summary judgment, an age discrimination claim under the ADEA and the CFEPA must survive the three-part burden-shifting test established by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  McDonnell Douglas, 411 U.S. at 802, 804-05; McPherson v. New York City Dept. of Educ.,457 F.3d 211, 215 (2d Cir. 2006); Miller v. Ethan Allen Global, Inc., No. 3:10-CV-01701, 2012 WL 1899378, at

*4 (D.Conn. May 24, 2012) (applying the McDonnell Douglas analysis to a CFEPA

claim).  Under this test,

> [A] plaintiff first bears the "minimal" burden of setting out a prima facie discrimination case, and is then aided by a presumption of discrimination unless the defendant proffers a "legitimate, nondiscriminatory reason" for the adverse employment action, in which event, the presumption evaporates and the plaintiff must prove that the employer's proffered reason was a pretext for discrimination.

McPherson, 457 F.3d at 215.  On summary judgment, the court must examine the

plaintiff's proffer of evidence to determine whether a jury could reasonably conclude,

based on that proffer, that the plaintiff's age actually motivated the defendant's conduct

and that age was the "but for" reason for that conduct.  Gross v. FBL Financial Servs.,

Inc., 557 U.S. 167, 177-78, 180 (2009).

    ii. Prima Facie Case

    To establish a prima facie case of age discrimination, Irizarry must show that 1)

he was within the protected age group; 2) he was qualified for the position; 3) he

experienced adverse employment action; and 4) that action occurred under

circumstances giving rise to an inference of discrimination.  Gorzynski v. JetBlue

Airways Corp., 596 F.3d 93, 107 (2d Cir. 2010).  The burden for establishing a prima

facie case of employment discrimination is "minimal."  McGuiness v. Lincoln Hall, 263

F.3d 49, 53 (2d Cir. 1997) (internal quotation marks omitted). As it is undisputed that

Irizarry was within the protected age group, qualified for his position, and experienced

an adverse employment action, he has established the first three elements of his prima

facie case.  Def.'s Mem. at 5; Pl.'s Opp. at 19.  Irizarry, then, must come forward with

sufficient admissible evidence that his termination occurred under circumstances

supporting an inference of discrimination.  See Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 65 (2d Cir. 1997).

Irizarry argues that his replacement by a younger co-worker, as well as the considerable difference in experience between him and his replacement, create an inference of discrimination.  An ADEA plaintiff who is replaced by a substantially younger worker, however, can only establish an inference of discrimination if he or she "offer[s] some evidence of a defendant's knowledge as to the significant age discrepancy to support a prima facie inference of discriminatory intent."  Woodman v. WWOR-TV, Inc., 411 F.3d 69, 90 (2d Cir. 2005).

The undisputed facts show that Ray, though responsible for deciding to terminate Irizarry, played no role in choosing his younger replacement; instead, Walsh chose Irizarry's replacement.[6]  Affidavit of Christopher Walsh ("Walsh Aff.") (Doc. No. 42-23) at ¶ 24; Affidavit of Dennis Ray ("Ray Aff.") (Doc. No. 42-26) at ¶ 37; Pl.'s L.R. 56(a)(2) Stmt. at Ex. E (Deposition of James Marciano), at 77:3-9.  Nothing in the record suggests that Ray had any input in Walsh's choice, or that Ray had any knowledge at all of who would replace Irizarry when he terminated Irizarry.  Ray, thus, could not have had knowledge of the "significant age discrepancy" between Irizarry and his replacement.

Irizarry, however, has tied Ray's decision to terminate him to the influence of Walsh, who not only replaced him with a younger UPS employee but also made ageist comments to him and Hasemann, by advancing a "cat's paw" theory of liability.  Pl.'s

_____

[6] Construing the facts in the light most favorable to Irizarry, the non-movant, the court will assume that Walsh's rotation of Caputo into Irizarry's position was the equivalent of replacing Irizarry with Caputo.

Amend. Opp. at 27-28.  In cases proceeding under this theory, "a plaintiff typically seeks to hold his employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision."  Rajaravivarma v. Bd. of Ct. State Univ. Sys., 862 F.Supp.2d 127, 149 (D.Conn. 2012).  In considering the applicability of "cat's paw" liability to a claim of employment discrimination under the Uniformed Services and Reemployment Rights Act (USERRA), the Supreme Court has held that, "if a supervisor performs an act motivated by antimilitary animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA."  Straub v. Proctor Hosp., 131 S.Ct. 1186, 1194 (2011) (emphasis in original omitted).  An act is a proximate cause of the ultimate employment action if "some direct relation between the injury asserted and the injurious conduct alleged" exists, and the link between the injury and the injurious conduct is not "too remote, purely contingent, or indirect."  Id. at 1192 (quoting Hemi Group, LLC v. City of New York, 559 U.S. 1, 9 (2010)).

Though Straub involved the USERRA, courts in this Circuit have extended its holding to the employment discrimination context.  See Rajaravivarma, 862 F.Supp.2d at 149-50 (applying Straub to Title VII claim and citing cases wherein other courts that have done the same); Hasemann v. UPS of Am. Inc., No. 3:11-CV-554, 2013 WL 696424, at *10-*11 (D. Conn. Feb. 26, 2013) (applying Straub to ADEA claim).  Further, while the Second Circuit has never formally adopted the "cat's paw" liability theory, it has recognized that "the impermissible bias of a single individual at any stage of [an employment decision-making process] may taint the ultimate employment decision . . . even absent evidence of illegitimate bias on the part of the ultimate decision-maker, so

long as the individual shown to have the impermissible bias played a meaningful role in the [employment decision-making] process." Bickerstaff v. Vassar College, 196 F.3d 435, 450 (2d Cir. 1999). The "cat's paw" liability theory is fully consistent with Bickerstaff. See Hasemann, 2013 WL 696424 at *11.

Because when precisely Walsh recommended that Irizarry be terminated to Ray cannot be determined an undisputed fact from the record before the court, a reasonable jury could find that Walsh was a proximate cause of Ray's decision to terminate, and thus, under the cat's paw theory, impute Walsh's replacement of Irizarry and Hasemann with younger employees to Ray. Walsh and Wheeler notified Ray of Irizarry's alleged misconduct in late December 2009. Ray Aff. at ¶ 15; Def.'s L.R. 56(a)(1) Stmt. at ¶ 101; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 101. Ray then submitted a summary of the allegations against Irizarry, as well as his recommended disciplinary action of withholding Irizarry's 2010 Merit Increase and MIP Award, to Loughery on January 5, 2010. Pl.'s Amend. L.R. 56(a)(2) Stmt. at Ex. R. He also shared the summary and recommendation with Di Libero.[7] Ray Aff. at ¶ 26; Def.'s L.R. 56(a)(1) Stmt. at ¶ 124; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 124. No recommendation to terminate Irizarry was made at this time by Ray.

In preparing his summary, Ray reviewed the memorandum Wheeler created based on his investigation into the allegations, Pinchbeck's memorandum to Bresnahan and his timeline of the closing, and the statements Irizarry and Hasemann provided.

---

[7] While Irizarry denies paragraph 124 of UPS's Local Rule 56(a)1 Statement, he provides only evidence countering Ray's claims that the recommendation for disciplining Irizarry that he sent to Loughery on January 5 was an "initial" one. Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 124. He cites no evidence that shows or suggests that Ray did not submit the summary and recommendation he prepared to Di Libero as well, and no such evidence exists in the record. Id.

Ray Aff. at ¶¶ 16-17; Def.'s L.R. 56(a)(1) Stmt. at ¶ 111; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 111.  Following his submission of the summary and recommendation to Loughery and Di Libero, Ray discussed the allegations with them.  Ray Aff. at ¶ 27; Def.'s L.R. 56(a)(1) Stmt. at ¶ 125; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 125.  Ray asserts that Di Libero supported termination; Irizarry does not dispute this claim.  Ray Aff. at ¶ 27; Def.'s L.R. 56(a)(1) Stmt. at ¶ 125; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 125.  At some point prior to reaching his final decision to terminate Irizarry, Ray also consulted both Walsh and Wheeler for their recommendations on what discipline to impose on Irizarry, and both Walsh and Wheeler recommended termination.  Ray Aff. at ¶ 24; Pl.'s Amend. L.R. 56(a)(2) Stmt. at Ex. T, at 186:20-25, 187:1-8; Walsh Aff. at ¶ 17; Affidavit of Christopher Wheeler (Doc. No. 42-25) at ¶ 12; Def.'s L.R. 56(a)(1) Stmt. at ¶ 104; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶¶ 94, 104.  Ray then determined that the appropriate disciplinary action for Irizarry was termination.  Ray Aff. at ¶ 27; Def.'s L.R. 56(a)(1) Stmt. at ¶ 125; Pl.'s L.R. 56(a)(1) Stmt. Reply at ¶ 125.

The above account of Ray's decision-making process is undisputed.  When precisely Walsh communicated his recommendation to terminate Irizarry to Ray, however, is unclear from the record.  Construing the facts in favor of Irizarry, the court must assume that Walsh made his recommendation after Ray had submitted his recommendation not to terminate to Loughery and Di Libero.  Given this, the court cannot conclude that a reasonable jury could not find that Walsh was a proximate cause of Ray's eventual decision to terminate Irizarry.  While Ray also spoke with Wheeler, who is not alleged to have had any age-related bias against Irizarry, and Wheeler also recommended termination, nothing within the record suggests that Ray spoke with

Wheeler <u>after</u> he recommended non-termination to Loughery and Di Libero.  The record could permit a fact-finder to determine that Ray spoke with Wheeler <u>before</u> he made his recommendation to simply revoke Irizarry's awards, and that he spoke with Walsh <u>after</u> he made this recommendation.  From such a finding, a reasonable jury could conclude that Walsh was a proximate cause of Ray's decision to terminate Irizarry and impute Walsh's replacement of Irizarry with a younger replacement to this decision.  The fact that Di Libero also recommended termination cannot alone persuade the court that no reasonable jury could find that Walsh was a meaningful influence on Ray's decision to terminate Irizarry.

While another court in this district concluded that no reasonable jury could find that Walsh was that "cat's paw" to Ray's decision to terminate in <u>Hasemann</u>, that court did not have before it evidence that Ray had first recommended discipline less than termination for Irizarry's misconduct.  <u>Hasemann</u>, 2013 WL 696424 at *2, *12.  This evidence, when taken with the circumstance (which the court must do on summary judgment) that Walsh recommended that Ray terminate Irizarry <u>after</u> Ray recommended non-termination, cautions against the adoption of <u>Hasemann</u>'s holding in this case.

The lesser qualifications of Irizarry's younger replacement further support an inference of discrimination.  <u>See</u> <u>Terry v. Ashcroft</u>, 336 F.3d 128, 139 (2d Cir. 2003) (finding an inference of discrimination where an allegedly significantly less qualified and significantly younger co-worker was promoted over plaintiff).  It is undisputed that Irizarry had over twenty-one years of experience as an Operations Supervisor, and that his replacement, Caputo, had only been a full-time supervisor for around eleven years. Def.'s L.R. 56(a)(1) Stmt. at ¶¶ 3-4, 145-46; Pl.'s Reply to Def.'s L.R. 56(a)(1) Stmt. at

¶¶ 3-4, 145-46.  Whether Caputo's responsibilities as a full-time supervisor were on par with those he assumed after his reassignment to Irizarry's post is ambiguous from the record.  UPS characterizes Caputo's position, prior to his reassignment, as both "Operations Supervisor" and "FT IE OPS Improvement [S]upervisor;" Irizarry asserts that, prior to his assumption of Irizarry's duties, Caputo did not supervise any employees.  Def.'s L.R. 56(a)(1) Stmt. at ¶¶ 145-46; Pl.'s Reply to Def.'s L.R. 56(a)(1) Stmt. at ¶¶ 3-4, 145-46.  UPS admits that Caputo was not made an On-Car Supervisor—the assignment Irizarry held at the time of his termination, and an assignment which involved supervision of employees—until May 2010, five months after he replaced Irizarry.  Def.'s L.R. 56(a)(1) Stmt. at ¶¶ 6-7, 146; Pl.'s Reply to Def.'s L.R. 56(a)(1) Stmt. at ¶ 146; Pl.'s Amend. L.R. 56(a)(2) Stmt. at ¶ 3.  Given the task upon the court here to resolve all ambiguities in favor of Irizarry, as well as the <u>de minimus</u> burden for establishing prima facie ADEA case, the court holds that a fact-finder could reasonably infer discrimination from UPS's decision to replace Irizarry with Caputo.

As a reasonable jury could find that Walsh was a "proximate cause" of Ray's decision to terminate Irizarry, that jury would have a  basis on which to impute Walsh's choice of a younger, less experienced replacement for Irizarry to Ray's decision and from that, infer  that his termination occurred under circumstances supporting an inference of discrimination.  Irizarry thus has met the "minimal" burden for establishing a <u>prima facie</u> case of employment discrimination.

ii.    Legitimate Nondiscriminatory Reason

UPS's burden of production for rebutting Irizarry's <u>prima facie</u> case for discrimination is "not a demanding one," and requires only "an explanation for the

27

employment decision," supported by evidence that, if true, would permit the conclusion that the reason for the decision was non-discriminatory.  Bickerstaff, 196 F.3d at 446; Schnabel v. Abramson, 232 F.3d 83, 88 (2d. Cir. 2000).  UPS contends that Irizarry was terminated for violating the UPS alcohol policy; it also asserts that Irizarry's violation of the Yard Control policy, and his exercise of "bad judgment for the second time in six months," justified termination.  Def.'s Mem. at 13-14.  UPS has submitted testimony from Ray, who was responsible for reaching the decision to terminate Irizarry, as well as the memorandum prepared by Ray setting out the infractions that ultimately formed the basis of his decision to terminate, as evidence supporting its explanation for terminating Irizarry.  Ray Aff. at ¶¶ 27-28, 38; Pl.'s Amend. L.R. 56(a)(2) Stmt. at Ex. R.  UPS has thus satisfied its burden here.

   iii. Pretext

  Once the defendant has articulated a non-discriminatory basis for the adverse employment action under the McDonnell Douglas framework, "the question in reviewing a motion for summary judgment becomes whether the evidence, when viewed in the light most favorable to the plaintiff, is sufficient to sustain a reasonable finding" that the employment action was actually motivated by discrimination.  Tori v. Marist College, 344 Fed. Appx. 697, 699 (2d Cir. 2009).  "The plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the [employment action]. . . .  To get to the jury, it is not enough . . . to disbelieve the employer; the factfinder must [also] believe the plaintiff's explanation of intentional discrimination."  Weinstock v. Columbia

University, 224 F.3d 33, 42 (2d Cir. 2000) (internal quotation marks and citations omitted).

While UPS has offered a legitimate non-discriminatory basis for terminating Irizarry, the court is still left with a genuine issue of material fact as to whether Ray's decision to terminate Irizarry was influenced by Walsh's alleged age bias, and thus, whether UPS's given basis for terminating Irizarry was false.  Drawing all inferences from the evidence in favor of Irizarry, the court concludes that Irizarry has presented sufficient evidence to support a jury finding that his termination was more likely that not motivated by discriminatory intent.  See Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 147 (2000) (finding it permissible "for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation"); see also Saulpaugh v. Monroe Community Hospital, 4 F.3d 134, 142 (2d Cir. 1993) ("[A] factfinder's disbelief of a defendant's proffered rationale may allow it to infer the ultimate fact of intentional discrimination in some cases.").  Summary judgment on Irizarry's ADEA and CFEPA claims is thus denied.

## V.    CONCLUSION

For the aforementioned reasons, UPS's Motion for Summary Judgment is **DENIED**.

**SO ORDERED.**

Dated at New Haven, Connecticut this 24th day of March, 2014.

  /s/ Janet C. Hall
Janet C. Hall
United States District Judge

29